**F. E. REUNING and Sarah Louise Reuning, Plaintiffs,**

**v.**

**C. V. HENKEL, Jr., Defendant.**

**Civ. A. No. 182.**

United States District Court W. D. North Carolina, Statesville Division.

Feb. 21, 1956.

R. A. Collier, Statesville, N. C., Donald T. Stant, Bradley Roberts, Bristol, Virginia-Tennessee, for plaintiffs.

John R. McLaughlin, C. B. Winberry, A. B. Raymer, Statesville, N. C., for defendant.

WARLICK, District Judge.

In this action plaintiffs, citizens of Virginia, seek a money judgment against defendant, a North Carolina citizen, on account of a sale to him by them of certain common and preferred stock which they owned in a Virginia corporation, and through which sale plaintiffs allege defendant enriched himself while acting as agent for them. An accounting of the funds derived through the sale is asked and a constructive or resulting trust is sought to be enforced. The amount sued for is $54,035.04.

Jurisdiction is alleged through diversity and amount. Section 1332, 28 U.S.C.

### Findings of Fact.

In 1943 defendant became engaged in the business of manufacturing woolen textiles in Bristol, Virginia, and leased space for such purpose from plaintiffs and other stockholders of Terminal Warehouse Company, Inc., a Virginia corporation (hereafter called Terminal).

The outstanding capital stock of Terminal consisted of 2,000 shares of common and 400 shares of preferred stock. F. E. Reuning owned 1,000 shares of common and his wife, Sarah Louise Reuning owned 200 shares of the preferred stock. Mr. and Mrs. Joe H. Fleming, who lived in Bristol and were for many years business associates and intimate personal friends of plaintiffs, owned a like amount of said stock. At that time the Warehouse building and some other adjacent real property made up the entire assets of the corporation, and all of its business activity related wholly to the rental of said property.

Defendant and his associates who were partners, rented all of the ground floor space of Terminal Building and secured

a lease therefor which terminated on September 30, 1949.

For some twenty years or more prior to 1943, plaintiffs, the Flemings, and others, at various intervening times, had operated different knitting mills in said building, and after some several corporate changes of name, and a somewhat erratic operating life, the machinery and equipment therein was sold and the business liquidated.

Sometime in the early part of 1946 Henkel, having acquired the interests of his associates, organized the Norwood Woolen Mills, Inc., a corporation (hereafter called Norwood), for the purpose of thereafter carrying on his manufacturing industry and the business and all property theretofore owned by the partnership was transferred to Norwood.

In June 1946, defendant purchased one half of the outstanding capital stock of Terminal from the Flemings and paid therefor the sum of $125,000. By this purchase Henkel became the owner of one half of the outstanding capital stock of Terminal with plaintiffs owning the remainder of said stock. I find that the Flemings regarded this sale as representing the fair market value of fifty percent of the outstanding capital stock of the corporation owned by them. This purchase was made by Henkel as a business investment and as a further protection to his lease rights in said real property.

At the time of the defendant's purchase of said stock the officers and directors of Terminal were Joe Fleming, President and Director; Fred E. Reuning, Vice President and Director; G. H. Buckles, Secretary-Treasurer and Director. The defendant at no time after acquiring an interest in the corporation was either an officer or director, and the evidence discloses that no meeting of the stockholders or directors was thereafter held during the year of 1946.

Virtually all of the machinery and equipment otherwise used and owned by Norwood was relatively new, much of it being less than one year old, and at that time all textile machinery was in great demand, as values were inflated, and deliveries under purchases made in many instances were extended over periods of from two to four years. This machinery, from the evidence submitted, is believed and so held, to have a reasonable or fair market value of $200,000. The demand for defendant's products was such that a continued operation was had and a substantial profit resulted, from the sales made. The profits for 1946 being in excess of $200,000.

The audit of Terminal from January 1, 1946 through December 26, 1946 showed a net profit of $639.82.

In addition to his Norwood operation in Bristol, the defendant had textile and other interests in North Carolina, and decided to shorten his base and sell the Norwood property if a suitable price could be obtained. Following up an advertisement which appeared in a textile trade magazine certain correspondence was had which ultimately resulted in the defendant being placed in business contact with representatives of Bigelow-Sanford Carpet Company, Inc., a large and successful manufacturing company of the New England area (hereafter called Bigelow). Subsequent correspondence and personal contacts ultimately brought representatives of Bigelow to Bristol. Later investigations were made and a survey had of the defendant's Norwood plant. During this preliminary period the Bigelow broker informed defendant that Bigelow likely had no interest whatever in buying any property other than the Norwood machinery and the equipment connected therewith, together with the lease of said building. Later, and on December 2, following Bigelow's call of that day to him, defendant went to Bristol and made known to the plaintiff Reuning that he was considering a sale of his Norwood interest at Bristol if a proper price could be had and informed him that recent conversations and letters indicated that Bigelow was considerably interested and was making some evident inquiries which led him to believe that their thoughts were more

than passing ones. Incidentally Reuning was told that a sale of the Terminal Building, the sole asset of the Warehouse Corporation, might be contemplated and that the defendant would like an option on plaintiff's stock so that he would be in a good trading position if Bigelow showed evidences of effecting a purchase. After some conversation and discussion Reuning agreed that the defendant could have the privilege of purchasing his stock in Terminal and that held by his wife for $150,000.

On December 3, when the three representatives of Bigelow came to Bristol and made a detailed survey and an analytical study of defendant's machinery, equipment, manufacturing products, productive capacity, labor relations, wage rates, etc., inquiry was made about the real property. Its status was explained to Bigelow's representatives and in consequence thereof boundary lines were determined, partial surveys by these representatives were made so that a full and complete report could be given to Bigelow.

From this report the executives of Bigelow were informed that a large saving would be effected in their opinion, by the purchase of defendant's Norwood property and such was recommended.

This report was of such character that on December 11, the President, and the Vice President in charge of manufacturing of Bigelow met with the defendant and made a further detailed and complete inspection of defendant's Norwood property and its real estate connected therewith and made a minute survey of the city of Bristol, before returning to New York.

On December 19, Bigelow's President, James D. Wise, called defendant and requested that he come to New York for talks and discussions on the proposed sale of his Norwood property. On receipt of this information the defendant called Reuning by phone, informing him of his conversation with the President of Bigelow, and in order to be definitely acquainted with his position, requested of plaintiff Reuning a confirmation of the option price of the twelve hundred shares of stock representing an exact one half interest in Terminal, at the price of $150,000.

On the following day, defendant and his attorney met with the executive officers of Bigelow in New York, and as a result of said meeting, a tentative agreement was had between the defendant and Bigelow to the effect that defendant would transfer and convey all of the machinery, equipment, mill supplies and personal property of Norwood to the Terminal Warehouse Company, Inc., and thereupon transfer all of the outstanding stock of Terminal to Bigelow for the sum of $475,000, and an additional $1,600 covering an uncrated machine.

Around noon on that day, following this understanding, defendant called Reuning at his home in Bristol and advised him that a proposed sale of the personal property owned by Norwood and the real property of Terminal had been effected and asked that plaintiffs endorse their stock and send it to New York, together with the resignation of Reuning as an officer and director of Terminal, so that it might, on its arrival in New York, be held in escrow by someone designated by plaintiffs, in which manner the stock would be available to the defendant if the agreement with Bigelow was consummated and so the defendant could exercise the option theretofore given on said stock. This inquiry being had by defendant as he had obligated himself to Bigelow.

Plaintiffs declined to approve this arrangement and informed defendant that if he desired the stock forwarded to New York so as to be available, for sale to Bigelow, that it would have to be by sight draft through bank channels with stock certificates attached for delivery when the purchase price was paid in full.

During the negotiations and prior to the first visit of the representatives of Bigelow to Bristol, defendant had agreed with Richard C. O'Brien, the commission agent who had brought defendant in

contact with Bigelow, that a five per cent commission would be paid to him.

Defendant on learning that if he had plaintiffs' stock delivered in New York, he would have to pay cash therefor, then informed Reuning in his conversation of the five per cent commission. Whereupon following some discussion Reuning agreed to reduce the option price to $145,000.

Sensing that he was getting considerably involved if he made this purchase of stock, Henkel immediately contacted Mr. Wise, President of Bigelow, and satisfied himself that the proposed transaction would go through, and thereafter again called Reuning, advising him that he would purchase plaintiffs' outstanding stock for $145,000, and directed him to send it, properly endorsed, and with his resignation as officer and director, on sight draft, drawn on defendant, to the Textile Banking Company of New York. This plaintiffs agreed to, and did.

That defendant on that same afternoon then contacted the Textile Banking Company and arranged the necessary financing for the purchase of plaintiffs' stock under the option.

On December 21, plaintiffs signed their stock certificates in blank and directed their bank, the Dominion National Bank of Bristol to forward said stock with sight draft for $145,000, through the bank's correspondent, the Central Hanover Bank of New York City, for presentation to the Textile Banking Company for payment. This draft on Monday, December 23, 1946, was presented to the Textile Banking Company and was paid in full.

That on December 24 plaintiffs were advised by their bank that the draft was paid and the proceeds thereof were later placed to plaintiffs' credit in Bristol.

When defendant and Bigelow met to reduce their tentative agreement of the preceding day to writing, Bigelow's attorneys took exception to the legal title of Terminal for that certain complications had arisen during the operation by one or more of its previous owners; that a receivership had come about and in their opinion a considerable number of technicalities were found which materially affected the title to the real estate. Defendant was thereupon informed that Bigelow would not accept a transfer of the certificates of stock as passing title, but would demand a conveyance with full warranty of title. It was then agreed that Terminal would be liquidated; that defendant would take title thereto in his own name, and in that manner convey ownership to the property to Bigelow with full covenants of warranty, etc. This requirement involving costs, taxes, and other varied expenses was finally agreed to, but not before Bigelow had agreed to the payment of an additional $35,000 as a full purchase price which made the final sale price from Bigelow to Henkel of $511,600.

During the period from December 26, 1946 and the dates on which the actual agreed contracts in both sales of property were executed, Terminal was dissolved and all of its assets were conveyed to Henkel in exchange and surrender of all of Terminal's capital stock. Henkel thereupon assuming all of the liabilities of Terminal. This deed of conveyance to Henkel was recorded in the Public Registry on December 27, 1946. Thereafter Henkel took over all of the property of Terminal, as owner, notified all tenants of his ownership and of their obligation thereafter to pay rent to him, hired watchmen, paid all bills, had insurance policies properly endorsed to himself, and did all and singular that an owner of property would commonly do.

Since Bigelow indicated little if any interest in the way the sale price of the property of Norwood and Terminal was allocated, defendant, on the advice of his tax attorney, entered into a contract with Bigelow on January 2, 1947, in which the Norwood property was sold for a recited consideration of $126,600.

On January 10, 1947, Henkel and Bigelow reduced their contract for the sale of the Terminal property to writing at

an agreed figure of $385,000. Deed was thereupon executed by Henkel and his wife and delivered to Bigelow, which contained full covenants of warranty, etc., under the laws of Virginia. The price paid in each instance being so agreed upon as to give Henkel a preferable tax advantage, in the opinion of his attorney.

Much public concern was shown by the people of Bristol on the coming South of Bigelow, and on January 14, 1947 and again on February 2, 1947, both daily papers of Bristol caused front page stories of the sale to Bigelow to be published. Incidentally referring to the great value which would come to the community by Bigelow's locating in their midst.

The bill of sale for the Norwood property and the deed from Henkel and wife to the Terminal property were delivered to Bigelow on February 3, 1947, and promptly placed of record in the Public Registry.

On that evening Henkel gave a dinner party at a leading hotel in Bristol for the Bigelow officials and two hundred odd citizens of the area, at which dinner meeting all present learned of the change of ownership of the properties involved.

In the sale of these properties Henkel incurred an expense of approximately $25,000.

The defendant and his family, during the three years of his connection in Bristol, became personal friends of plaintiffs and each regarded the other highly.

### Contentions.

Plaintiffs contend from the evidence that they were lulled to sleep by the false and fraudulent representations of the defendant in the purchase of their stock, and that defendant, knowing that a sale was imminent, took advantage of their lack of knowledge and through such misrepresentation of value, etc., misled them and brought about a sale of their stock to his advantage and gain. That the parties were joint owners of the capital stock of Terminal and that a duty was owed to them by defendant and that such was not performed and that they were falsely and wrongly led into selling their stock. That they are entitled to recover one half of the profits resulting from the sale of the Terminal property to Bigelow, together with one half of the amounts received by Henkel from the sale of the coal, a rebate arising from cancellation of prepaid insurance, the tax refund from the government to Terminal, and one half of the cash on hand, all totalling the amount of $54,035.04 which is that sought to be recovered. That a constructive and resulting trust arises from these facts in their favor.

The defendant contends among other things that no such relationship existed. That the plaintiffs and defendant each owned one half of the capital stock of Terminal; that he never falsely advised plaintiffs or took any advantage of them; that they at all times knew of the transactions had, and sold their stock openly and were paid therefor; that he owed no duty to them and only purchased the stock sold to him when it appeared that that was the only available means by which title could be had. Defendant further pleads the three-year statute of limitations, G.S.N.C. § 1–52.

He further contends that originally his intentions centered solely on the sale of his Norwood property but that when Bigelow indicated an interest in the Terminal property that he made such known to plaintiffs thereby hoping to sell his one half ownership of Terminal stock and have plaintiffs to do likewise, but when plaintiffs failed to go along, that it then became necessary for him to and he did purchase plaintiffs' stock, and disposed of it as is herein set out.

### Conclusions of Law.

The complaint in this action was filed on November 24, 1950, and summons accordingly issued on that date.

The briefs filed by counsel having to do with the statute of limitations do not cite any Virginia statutes or decisions, but devote full effort in the citation of North Carolina authorities. In my opinion a decision on the statute of limitations would obviously involve a knowledge of the laws of Virginia. Unquestionably the rights of the parties are governed by the *lex loci*. This has been universally held as the law in North Carolina for more than one hundred years, and appears to be the law of the land.

"In the trial of an action, whatever relates merely to the remedy and constitutes a part of the procedure is determined by the law of the forum; but whatever goes to the substance of the controversy and affects the rights of the parties is governed by the *lex loci*. Pritchard v. Norton, 106 U.S. 124, 1 S.Ct. 102, 27 L.Ed. 104; Haws v. Cragie, 49 N.C. 394; Arrington v. Arrington, 127 N.C. 190, 37 S.E. 212, 52 L.R.A. 201; Patton v. [W. M. Ritter] Lumber Co., 171 N.C. 837, 73 S.E. 167." Wise v. Hollowell, 205 N.C. 286, 171 S.E. 82, 83.

However, since my decision disposes of the action on its *merits,* I will not devote any further consideration to the plea of the statute of limitations.

Taking into consideration all of the evidence heard and the facts found herein, and interpreting them in such way as to reflect, as I believe the truth thereof, I find that Henkel made an out and out purchase of the certificates of stock owned by plaintiffs and paying therefor the agreed purchase price, was at liberty to sell and dispose of the property which it represented in such way and for such sums as he saw fit, and doing so, is entitled to retain the proceeds thereof as property rightfully his.

I hold therefore that plaintiffs are not entitled to recover any sum whatsoever from the defendant.

Counsel will submit decree.